[Cite as *State v. Purefoy*, 2018-Ohio-246.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

NIGEL B. PUREFOY

    Appellant

C.A. No.     28597

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 2014 09 2742

DECISION AND JOURNAL ENTRY

Dated: January 24, 2018

---

TEODOSIO, Judge.

{¶1}    Appellant, Nigel Purefoy, appeals from his convictions in the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2}    This Court previously summarized the procedural history of this case as follows:

On September 23, 2014, the Summit County Grand Jury indicted Purefoy on two counts of aggravated burglary and three counts of aggravated robbery. All five counts in the indictment were accompanied by a firearm specification, and the final count of aggravated robbery also contained a criminal forfeiture specification. Purefoy pleaded not guilty to the charges at arraignment.

Purefoy subsequently pleaded guilty to three counts of aggravated robbery. Shortly thereafter, however, Purefoy filed a handwritten motion to withdraw his guilty pleas. The trial court granted Purefoy's motion to withdraw his guilty pleas and appointed new counsel.

On April 20, 2015, Purefoy filed numerous motions, including a motion to suppress statements he made to police during an interview at the Barberton Police Department. After holding a hearing on the motion to suppress, the trial court issued a journal entry denying the motion on June 29, 2015.

Prior to trial, Purefoy filed a motion to dismiss the indictment on speedy trial grounds. The trial court denied the motion. The matter proceeded to a jury trial and Purefoy was convicted of all of the counts in the indictment, as well as the attendant specifications. The trial court sentenced Purefoy to a total of 18 years imprisonment.

*State v. Purefoy*, 9th Dist. Summit No. 27992, 2017-Ohio-79, ¶ 2-5.

{¶3} Mr. Purefoy appealed his convictions and this Court affirmed in part, concluding that the trial court did not violate Mr. Purefoy's constitutional right to a speedy trial. *Id.* at ¶ 7. We also reversed in part and remanded the matter back to the trial court "to make factual findings and then address the motion to suppress in the first instance[,]" but we took no position on the legal arguments Mr. Purefoy raised in challenging the denial of his motion to suppress. *Id.* at ¶ 18. We declined to address Mr. Purefoy's manifest weight of the evidence argument as premature. *Id.* at ¶ 20. On remand, the trial court made the requisite findings in an order and denied Mr. Purefoy's motion to suppress.

{¶4} Mr. Purefoy now appeals from his convictions and raises two assignments of error for this Court's review.

II.

**ASSIGNMENT OF ERROR ONE**

THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT ALLOWED THE INTRODUCTION OF COERCED STATEMENTS IN VIOLATION OF MR. PUREFOY'S [] RIGHTS UNDER THE 5TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶5} In his first assignment of error, Mr. Purefoy essentially argues that the trial court erred in failing to suppress the confession he made to police because it was coerced and involuntary. We disagree.

{¶6} A motion to suppress presents a mixed question of law and fact:

When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

*State v. Oberholtz*, 9th Dist. Summit No. 27972, 2016-Ohio-8506, ¶ 5, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

{¶7} Mr. Purefoy argues that he was in custody and was coerced by his uncle, Sergeant Jerome Hall of the Summit County Sheriff's Office, into making statements against his interest. He argues that his statements were not voluntary because his uncle was present and in full uniform during the interview with police, and his uncle pressured him into making incriminating statements by telling him to "come clean and confess."

{¶8} Upon remand, the trial court issued an order complying with this Court's decision in *Purefoy* and made the following findings of fact:

The [c]ourt finds Defendant was not in custody for purposes of *Miranda*. Defendant voluntarily went to the Barberton police station, was not under formal arrest, and Defendant's movement was not restrained such that a reasonable person would have believed he was under arrest. During the interview, Defendant was not handcuffed or otherwise physically restrained; the door to the interview room was closed, but not locked; Defendant was not told he was under arrest or that he could not leave; Defendant was not threatened in any way; the police did not dominate the interview; Defendant was permitted to consult with a family member upon his request; and, the police did not overpower Defendant's will or coerce Defendant into making a statement. * * * The [c]ourt finds the interview was non[-]custodial, therefore, *Miranda* was not triggered until the time Detective Kline entered the interview room and informed Defendant that he was under arrest for the Green robbery, could not leave, and was read his *Miranda* rights.

{¶9} In discussing Sergeant Hall's level of involvement in the interview and investigation, the trial court found:

Hall was not a part of the investigation and had no knowledge of any law enforcement action concerning Defendant until after he arrived at the Barberton

police station with Defendant. Hall did not enter the interview room until Defendant requested Hall's presence seeking Hall's advice on how to proceed. The fact that Hall strongly encouraged Defendant to "come clean" was not the result of any official action by a law enforcement agency or the Summit County Sheriff's Department, but, as an uncle, trying to advise his young nephew how to navigate his predicament. At no time did Defendant request Hall to leave the interview room.

The court found no coercion on the part of Sergeant Hall or the other officers. None of the officers brandished weapons or otherwise threatened Mr. Purefoy. Thus, the trial court found Mr. Purefoy's statements to the police to be voluntary.

{¶10} Upon review of the record, this Court accepts the trial court's findings as supported by competent, credible evidence. *See Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8. At the suppression hearing, Detective Robert Russell of the Barberton Police Department testified that Mr. Purefoy's vehicle had been towed from an area near the scene of a recent robbery. Mr. Purefoy called to get his car out of impound and his calls were directed to Detective Jamison. Mr. Purefoy made the calls from the same phone number that was used to contact the victim of the robbery. Mr. Purefoy voluntarily came to the police department with his uncle, Sergeant Hall, to talk to the police about retrieving his impounded vehicle.

{¶11} Detective Russell testified that he did not speak to Sergeant Hall prior to starting the interview with Mr. Purefoy. Sergeant Hall was not in the interview room, but remained out in a hallway. Detective Russell testified that Mr. Purefoy was not under arrest or in handcuffs and was free to walk out the door. The doors to the interview room were both closed to keep out distracting noises from neighboring offices, but they were not locked.

{¶12} Meanwhile, Detective Jason Kline of the Summit County Sheriff's Office arrived at the police station with an arrest warrant for Mr. Purefoy for a similar, but separate case. Detective Russell testified that he knew Detective Kline was investigating Mr. Purefoy for a

similar robbery case, but he was unaware that Detective Kline had obtained an arrest warrant for Mr. Purefoy. Detective Kline testified that Sergeant Hall did not play any role in the questioning of Mr. Purefoy. He testified: "I didn't know [Sergeant Hall] was going to be there until I walked in the door and saw him there. He wasn't part of the plan. * * * It was never any conspiracy to have him sit in there and be an influence. It was only when Purefoy requested [Sergeant Hall's] assistance was (sic) he even allowed in that room."

{¶13} A video of the interview was entered into evidence at the suppression hearing. In the video, Mr. Purefoy sits down in a chair and is not handcuffed or restrained in any way. Detective Russell does not place Mr. Purefoy under arrest, tell him he is not free to leave, or threaten him in any way. The detective speaks to Mr. Purefoy privately for about 20 minutes before Mr. Purefoy asks, "Can I have my uncle step in here?" Detective Russell asks him to hold on and Mr. Purefoy responds, "Yeah, but I really wanna have my uncle step in here." A few minutes later, Mr. Purefoy again asks, "Can I speak to my uncle?" and Detective Russell leaves the room to retrieve Sergeant Hall. Sergeant Hall speaks to Mr. Purefoy privately in the interview room for several minutes, but this private conversation was suppressed by agreement of the parties at the suppression hearing.

{¶14} In the video, Detectives Roberts and Kline then enter the room while Mr. Purefoy and Sergeant Hall both remain in the room. Detective Kline informs Mr. Purefoy that he is now in custody and then reads Mr. Purefoy his *Miranda* rights. Mr. Purefoy indicates that he understands each of his rights individually, and he then signs a *Miranda* waiver form. The two detectives proceed to question Mr. Purefoy, but Sergeant Hall is not involved in any of the questioning and he remains silent for a majority of the interview. Occasionally, when Mr. Purefoy appears to become emotional and is visibly agonizing over how to answer some of the

detectives' questions, Sergeant Hall offers brief but compassionate advice to his nephew. Sergeant Hall only makes the following comments to Mr. Purefoy: "Like I told you, help yourself, man"; "Before I said help yourself. At this point, you know, they let the Judge know and it makes a difference. It makes a difference, man"; and "Don't do this by yourself, man."

{¶15} Mr. Purefoy mentions a few times that he is hungry in the video, so Sergeant Hall takes his order and goes to McDonald's for him. When Sergeant Hall returns with the food, he simply tells Mr. Purefoy, "Be truthful, man." While Sergeant Hall is still standing in an open doorway, the detectives reinforce the importance of honesty to Mr. Purefoy. Sergeant Hall then tells Mr. Purefoy, "That's what I go back to tell you, help yourself. At this point, help yourself." Mr. Purefoy soon asks for an attorney, and all further conversations were suppressed by agreement of the parties at the suppression hearing.

{¶16} Having accepted the trial court's findings as supported by competent, credible evidence, we must consider the trial court's legal conclusions that Mr. Purefoy was not in custody for *Miranda* purposes prior to Detective Kline entering the room and formally placing him in custody and that Mr. Purefoy's statements to the police were voluntary and not coerced.

{¶17} The Fifth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, provides that no person "shall be compelled in any criminal case to be a witness against himself." Article I, Section 10, of the Ohio Constitution contains nearly identical language. In order to protect a defendant's Fifth Amendment right against self-incrimination, statements resulting from custodial interrogations are admissible only after a showing that law enforcement officers have followed certain procedural safeguards. *See Miranda v. Arizona*, 384 U.S. 436 (1966). "Specifically, an individual must be advised prior to custodial interrogation that: 1) he has a right to remain silent; 2) any statement he makes may be

used as evidence against him, and 3) he has a right to the presence of an attorney." *North Ridgeville v. Hummel*, 9th Dist. Lorain No. 04CA008513, 2005-Ohio-595, ¶ 27.

{¶18} "Custodial interrogation" was defined in *Miranda* as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, ¶ 27, quoting *Miranda* at 444. "Custody" for purposes of entitlement to *Miranda* rights exists only when there is a "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983), quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Whether a suspect is in custody for *Miranda* purposes depends on "whether, under the totality of the circumstances, a 'reasonable person would have believed that he was not free to leave.'" *State v. Dunn*, 9th Dist. Lorain No. 04CA008549, 2005-Ohio-1270, ¶ 24, quoting *State v. Gumm*, 73 Ohio St.3d 413, 429 (1995), quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." (Citations omitted.) *Howes v. Fields*, 565 U.S. 499, 509 (2012).

{¶19} "One may waive the Fifth Amendment right against self-incrimination, if it is done 'voluntarily, knowingly and intelligently.'" *State v. Powe*, 9th Dist. Summit No. 21026, 2002-Ohio-6034, ¶ 7, quoting *Miranda* at 444. "'Voluntariness' is the absence of physical and psychological coercion on the part of the police." *State v. Ward*, 9th Dist. Lorain No. 95CA006214, 1996 Ohio App. LEXIS 3253, *4 (July 31, 1996). "'Coercion' means misconduct which overbore the defendant[']s free will in such a way as to be a violation of the federal Constitution[']s Fourteenth Amendment." *Id.*

{¶20} Mr. Purefoy voluntarily went to the police station along with his uncle in an effort to retrieve his impounded vehicle. When he first arrived, he spoke casually with Detective Roberts about the vehicle and was not placed under arrest or taken into custody. He sat down in a chair and was not handcuffed, restrained, or told that he was not free to leave. The room's two doors were closed for privacy, but were not locked. When Mr. Purefoy asked if he could speak to his uncle, Detective Roberts granted the request and allowed Mr. Purefoy several minutes to speak to his uncle privately. Under these circumstances, we cannot conclude that a reasonable person in Mr. Purefoy's situation would have believed that he was not free to leave. *See Dunn*, 2005-Ohio-1270, at ¶ 24. Accordingly, we conclude that Mr. Purefoy was not in custody for *Miranda* purposes prior to Detective Kline entering the room and formally placing him in custody.

{¶21} The trial court also disagreed with Mr. Purefoy's argument that his statements to the police were not voluntary, but were instead the product of police coercion since Sergeant Hall was wearing his police uniform and pressuring Mr. Purefoy into making incriminating statements. "[T]he Fifth Amendment privilege is not concerned 'with moral and psychological pressures to confess emanating from sources other than official coercion.'" *Colorado v. Connelly*, 479 U.S. 157, 170 (1986), quoting *Oregon v. Elstad*, 470 U.S. 298, 305 (1985). "*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Connelly* at 170. "'[T]he state carries the burden of proving the voluntariness of a confession by a preponderance of the evidence.'" *State v. Wooden*, 9th Dist. Summit No. 23992, 2008-Ohio-3629, ¶ 7, quoting *State v. Hill*, 64 Ohio St.3d 313, 317 (1992). "The voluntariness of a confession is reviewed under a totality-of-the-circumstances standard." *Id.* "The totality of the circumstances includes 'the age,

mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *Id.*, quoting *State v. Edwards*, 49 Ohio St.2d 31 (1976), paragraph two of the syllabus, *overruled on other grounds Edwards v. Ohio*, 438 U.S. 911 (1978). The decision to waive the right to Fifth Amendment privilege against self-incrimination is considered voluntary absent evidence that a person's will was overborne and that his capacity for self-determination was critically impaired because of coercive police conduct. *Id.*

{¶22} Here, Sergeant Hall accompanied Mr. Purefoy and gave him a ride to the police station, but remained in the hallway while Mr. Purefoy spoke privately to Detective Roberts about retrieving his impounded vehicle. It was only after Mr. Purefoy thrice requested Sergeant Hall's presence in the room that Detective Roberts brought Sergeant Hall into the room. Detective Roberts then stepped out of the room and allowed the two men some time to speak privately to each other. After Detective Roberts and Detective Kline entered the room, officially placed Mr. Purefoy in custody, and read him his *Miranda* rights, they asked him some more questions. Sergeant Hall remained in the room and Mr. Purefoy never asked him to leave. Sergeant Hall never asked Mr. Purefoy any questions during the interview. Sergeant Hall's occasional comments were few and far between and were limited to variations of statements encouraging Mr. Purefoy to "help himself" and "be truthful." "Suspects have no constitutional protection against friends or family members who convince them to talk with police." *Van Hook v. Anderson*, 488 F.3d 411, 421 (6th Cir.2007). Moreover, "[a]dmonitions to tell the truth are not coercive in nature." *State v. Martinez*, 8th Dist. Cuyahoga Nos. 103572 & 103573, 2016-Ohio-5515, ¶ 32. *See also State v. Loza*, 71 Ohio St.3d 61, 67 (1994) ("Admonitions to tell the truth are considered to be neither threats nor promises and are permissible."). At no time does

Sergeant Hall tell Mr. Purefoy to confess to any crimes or make any other incriminating statements. He does not appear to be involved in either of the criminal investigations or otherwise working with the other two officers in any official capacity, and he is only present in a supportive role on Mr. Purefoy's behalf and at Mr. Purefoy's request. Mr. Purefoy was not threatened or mistreated in any way during the interview. When he claimed he was hungry, Sergeant Hall brought him some food. In fact, near the end of the interview, Mr. Purefoy actually says to the officers, "I just wanna say thanks. I just wanna say thank you for not mistreating me. Thank you. Thank you for not mistreating me. I've had bad experiences with police officers that I was, I just, I'm scared of 'em. I'm scared of them." Considering the totality of the circumstances in Mr. Purefoy's case, we cannot conclude that his will was overborne or that his capacity for self-determination was critically impaired because of coercive police conduct. *See Wooden* at ¶ 7. Thus, we conclude that his statements to the police were voluntary and not the byproduct of any coercion on the part of the police.

{¶23} Accordingly, we conclude that the trial court did not err in denying Mr. Purefoy's motion to suppress.

{¶24} Mr. Purefoy's first assignment of error is overruled.

## ASSIGNMENT OF ERROR TWO

MR. PUREFOY'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE [] IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1, 10 & 16 OF THE OHIO CONSTITUTION.

{¶25} In his second assignment of error, Mr. Purefoy argues that his convictions are against the manifest weight of the evidence because the State failed to prove the existence of a firearm and only the victims testified that a firearm was involved, all of whom he argues lied to the police and had prior felony convictions for offenses involving dishonesty. We disagree.

{¶26} This Court has stated:

> In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[W]hen reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a 'thirteenth juror,' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Tucker*, 9th Dist. Medina No. 06CA0035-M, 2006-Ohio-6914, ¶ 5. This discretionary power "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶27} Initially, we note that in Mr. Purefoy's second assignment of error he asserts that his convictions were against the manifest weight of the evidence, while his underlying argument alleges that "the State failed to prove the existence of a firearm [and] the trier of fact in this matter clearly lost its way and created * * * a manifest miscarriage of justice * * *." However, the first part of this argument is essentially a sufficiency of the evidence argument that challenges whether the State proved he had a firearm in this case. "A weight challenge tests the persuasiveness of the evidence the State produced while a sufficiency challenge tests the very production of that evidence." *State v. Hayes*, 9th Dist. Summit No. 26388, 2013-Ohio-2429, ¶ 9. "An argument that the State failed to prove one of the elements of a crime is one sounding in sufficiency, not weight." *Id.* "[S]ufficiency and manifest weight are two separate, legally distinct arguments." *State v. Vincente-Colon*, 9th Dist. Lorain No. 09CA009705, 2010-Ohio-6242, ¶ 20. Because Mr. Purefoy's stated assignment of error presents this Court with strictly a

weight challenge and because that is the only standard of review that he sets forth in his brief, we limit our review to that issue. *See State v. Lewis*, 9th Dist. Summit No. 28064, 2017-Ohio-2747, ¶ 14.

{¶28} Mr. Purefoy was convicted of two counts of aggravated burglary under R.C. 2911.11(A)(2), which states:

> No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if * * * [t]he offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

He was also convicted of three counts of aggravated robbery under R.C. 2911.01(A)(1), which states:

> No person, in attempting or committing a theft offense * * * or in fleeing immediately after the attempt or offense, shall * * * [h]ave a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it * * *.

Mr. Purefoy was also convicted of five firearm specifications under R.C. 2941.145(A), which prohibits an offender from "ha[ving] a firearm on or about the offender's person or under the offender's control while committing the offense and display[ing] the firearm, brandish[ing] the firearm, indicat[ing] that the offender possesse[s] the firearm, or us[ing] it to facilitate the offense." A "firearm" is any "deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant[, including] an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." R.C. 2923.11(B)(1). "In determining whether an individual was in possession of a firearm * * * the trier of fact may consider all relevant facts and circumstances surrounding the crime, which

include any implicit threat made by the individual in control of the firearm." *Thompkins*, 78 Ohio St.3d at 385.

{¶29} Mr. Purefoy challenges the veracity of E.C.'s testimony at trial because she has prior felony convictions and she initially denied to the police having any knowledge about her online advertisement for her services as an escort. E.C. testified that she has prior felony convictions for theft from the elderly and forgery. She did not make any deal with the State in exchange for her testimony. She testified that when Mr. Purefoy responded to her advertisement and arrived at her hotel, he pulled up his shirt and showed her that he had a black pistol that "looked like a Beretta" and "looked like what the sheriff's (sic) carry" in the waistband of his pants. She testified that she is familiar with Berettas because she was in the military and has also known lots of friends who had guns. After Mr. Purefoy followed E.C. back into her room and she closed the door, Mr. Purefoy pulled out the gun, pointed it at her, and robbed her. He told her that if she screamed he was going to shoot her. She testified that he told her not to make a sound or he would "blow [her] brains out." He also told her not to follow him or he would shoot her. E.C. testified that she was addicted to heroin at that time in her life, but was not under the influence of drugs, alcohol, or medication at the time of the robbery. She testified that she was initially afraid to tell the police the truth because (1) being an escort is illegal, (2) she was afraid of being arrested, and (3) she was worried the police would not believe her. She eventually told the police the truth.

{¶30} Mr. Purefoy also challenges the veracity of L.S.' testimony at trial because she had felony drug and misdemeanor theft convictions, she initially lied to police about her escort advertisement and the events that transpired, and she admitted to using drugs at the time of the incident. L.S. testified that she is addicted to heroin and would advertise massage services

online, which would sometimes become sexual in nature. She testified that when Mr. Purefoy responded to her advertisement, he arrived and used her restroom, but said that he forgot his money in the car. He left and soon returned with another man. She testified that when the men came inside and closed the door, Mr. Purefoy pointed a black pistol at her head and said, "I want all your money and I want that TV." The pistol had a short barrel, "looked like a real gun[,]" and looked "like what the police use." L.S. testified that she has "sold a bunch of guns on the streets" and "know[s] what guns look like." She testified that Mr. Purefoy held the gun sideways in his right hand. L.S. admitted that she had used heroin and pills that day "[p]robably in the morning[,]" but she was not high at the time of the robbery. She testified that she was not immediately honest with the police because she did not want to get into trouble for prostitution. Once the officer told her that he was only interested in the robbery, L.S. told him the truth. L.S. testified that she was not offered any deals from the State to testify in Mr. Purefoy's trial.

{¶31} Mr. Purefoy also challenges the veracity of A.O.'s testimony at trial because she had prior convictions for drug possession and theft and lied to police about her prostitution, her online advertisement, Mr. Purefoy's arrival at her home, and her prior contact with Mr. Purefoy. A.O. testified that she was not offered any deals from the State to testify at Mr. Purefoy's trial. She testified that Mr. Purefoy responded to her online advertisement for companionship and, when he arrived, she told him that he looked familiar. Mr. Purefoy pulled out a black pistol that looked real, "cocked it," pointed it at her head, and told her not to scream. A.O. testified that she had used drugs that morning, but was not high at the time of the robbery. She admitted that she initially lied to the police when she said Mr. Purefoy had just knocked on her door, but only because she did not want to get into trouble for soliciting. When the police later confronted her with her online advertisement and asked her to be truthful, she admitted the truth to the police.

{¶32} Upon review of the record, this Court cannot conclude that the jury lost its way or created a manifest miscarriage of justice when it found Mr. Purefoy guilty of aggravated burglary, aggravated robbery, and the attendant firearm specifications. Although the firearm was ultimately never found, the mere fact that the State did not locate and produce the firearm at trial does not transform Mr. Purefoy's convictions into a manifest miscarriage of justice. *See State v. Elder*, 9th Dist. Summit Nos. 25217 & 25259, 2011-Ohio-294, ¶ 53. This Court has held that the lack of physical evidence is not dispositive, but merely a factor for the jury to weigh, and evaluating the evidence and assessing the credibility of the witnesses are primarily for the trier of fact. *State v. Henderson*, 9th Dist. Summit No. 27078, 2014-Ohio-5782, ¶ 31. All three victims testified that Mr. Purefoy had a black pistol and pointed it at them during the robberies. Two of them testified that it looked like a real gun and two of them testified as to their familiarity with guns. The jury was free to accept the victims' testimony that Mr. Purefoy used a firearm during the commission of these crimes. The victims all admitted to their prior convictions and the jury was free to either consider those convictions or discount them accordingly. *See State v. Samuel*, 10th Dist. Franklin No. 11AP-158, 2011-Ohio-6821, ¶ 32. As to the victims' admissions that they all initially lied to the police regarding their online advertisements for sexual services, the jury was free to believe the reasonable explanations offered by the victims that they feared being charged for escorting, prostitution, or soliciting. *See State v. Darthard*, 10th Dist. Franklin No. 07AP-897, 2008-Ohio-2425, ¶ 18 ("[T]he jury [i]s not precluded from believing a witness simply because the witness may have been, to some degree, uncooperative with the police."). "This Court will not overturn a conviction because the jury chose to believe the testimony offered by the prosecution." *State v. Tobey*, 9th Dist. Medina No. 05CA0103-M, 2006-Ohio-5069, ¶ 27. "The jury had the opportunity to view the witnesses' testimony and adjudge their credibility;

therefore, we must give deference to the jurors' judgments." *State v. Clayton*, 9th Dist. Summit No. 26910, 2014-Ohio-2165, ¶ 25. This is also not an exceptional case where the evidence presented weighs heavily in favor of the appellant and against conviction. Accordingly, we conclude that Mr. Purefoy's convictions were not against the manifest weight of the evidence.

{¶33} Mr. Purefoy's second assignment of error is overruled.

III.

{¶34} Mr. Purefoy's first and second assignments of error are overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

THOMAS A. TEODOSIO
FOR THE COURT

SCHAFER, P. J.
CONCURS.

CARR, J.
CONCURS IN JUDGMENT ONLY.


APPEARANCES:

PAUL GRANT, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.